Case: 1:22–mj–00215
Assigned To : Magistrate Judge Upadhyaya, Moxila A.
Assign. Date : 9/29/2022
Description: Complaint w/ Arrest Warrant

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Joy Gallante, being duly sworn, depose and state as follows:

### I.       INTRODUCTION AND SUMMARY OF PROBABLE CAUSE

1.       Based upon my participation in the investigation, I have become familiar with a scheme to facilitate illegal access to the U.S. financial system by entities affiliated with the Democratic People's Republic of Korea (DPRK) a/k/a North Korea, including the state-operated Foreign Trade Bank (FTB). The scheme was carried out by North Korean national SIM Hyon-Sop and others.

### II.      AGENT BACKGROUND

2.       I am a Special Agent with the Federal Bureau of Investigation ("FBI"), currently assigned to the FBI Phoenix Field Office. I have been a Special Agent with the FBI since 2002. Since approximately 2002, I have principally been involved in national security investigations. Specifically, I have been involved in investigations involving counterintelligence, export violations, sanctions violations, and illicit finance. I have received training in the laws and regulations relating to the International Emergency Economic Powers Act ("IEEPA"), pursuant to Title 50, United States Code, Sections 1701 through 1707. Additionally, I have received training in, among other things, criminal investigative techniques, and I have participated in investigations involving the violation of IEEPA, including laundering illegal proceeds, by causing funds to be transferred through U.S. banks for the benefit of prohibited entities.

3.       The facts set forth in this affidavit are based on information that I have obtained from my personal involvement in the investigation and from other law enforcement officers who have been involved in this investigation, on documents that I have reviewed, and on my training

and experience. Where I have reported statements made by others or from documents that I have reviewed, those statements are reported in substance and in part, unless otherwise indicated.

4.     This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Because this affidavit is being submitted for a limited purpose, I have not set forth all of the information known to me concerning this investigation. Instead, I have set forth information that I believe to be sufficient to establish probable cause in support of the government's application for an arrest warrant.

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that SIM Hyon-Sop and other co-conspirators known and unknown, have violated 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 1344 (Bank Fraud), 31 U.S.C. § 5322 (the Bank Secrecy Act), 50 U.S.C. § 1705 (IEEPA), and 18 U.S.C. §§ 1956(a)(2)(A) and (h) (Money Laundering).

## III.   VENUE

6.     As discussed more fully below, acts or omissions (*i.e.*, the failure to obtain a license from the Department of the Treasury) in furtherance of the offenses under investigation occurred within Washington, D.C. *See* 18 U.S.C. § 3237.

## IV.   RELEVANT LEGAL BACKGROUND

### A.   Sanctions Against North Korea

7.     The Trading with the Enemy Act ("TWEA") of 1917, codified at 12 U.S.C. § 95 and 50 U.S.C. § 4301 *et seq.*, authorized the President to restrict trade between the United States and countries to which it is adverse. On December 16, 1950, the President designated the Democratic People's Republic of Korea ("DPRK" or "North Korea"), under TWEA. North Korea remained designated as such until June 26, 2008.

8.     Under TWEA, U.S. financial institutions were barred from conducting transactions for the benefit of North Korea, to include "[a]ll transfers of credit and all payments between, by, through, or to any banking institution or banking institutions wheresoever located, with respect to any property subject to the jurisdiction of the United States or by any person (including a banking institution) subject to the jurisdiction of the United States." 31 C.F.R. § 500.201 (2006 ed.).

**B.     United Nations Sanctions**

9.      In December 1985, North Korea ratified the Nuclear Non-Proliferation Treaty ("NPT"). On January 10, 2003, North Korea withdrew from the NPT. On October 14, 2006, the United Nations ("UN") Security Council passed Resolution 1718 condemning North Korea's first nuclear test and imposing sanctions on North Korea, including the supply of heavy weapons and select luxury goods. After successive nuclear tests by North Korea, the UN Security Council strengthened or imposed additional sanctions in 2009, 2013, 2016 and 2017.

**C.     IEEPA**

10.     The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50 U.S.C. § 1701 *et seq.*, enacted in 1977, authorized the President to impose economic sanctions in response to an unusual or extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat.

11.     The Departments of the Treasury, Commerce, and State enforce and administer economic sanctions under their respective authorities, to accomplish U.S. foreign policy and national security goals. In particular, the Department of the Treasury publishes a publicly available list of individuals and entities ("Specially Designated Nationals and Blocked Persons" or "SDNs") targeted by U.S. economic sanctions. An SDN's property and interests in property, subject to U.S.

jurisdiction or in the possession and control of U.S. persons, are blocked when the SDN is placed on the SDN list. U.S. persons, including U.S. financial institutions, are generally prohibited from dealing with SDNs and their property and interests in property.

12.     Using the powers conferred by IEEPA, the President and the Executive Branch have issued orders and regulations governing and prohibiting certain transactions with countries, individuals, and entities suspected of proliferating Weapons of Mass Destruction ("WMD"). On November 14, 1994, the President issued Executive Order ("EO") 12,938, finding "that the proliferation of nuclear, biological, and chemical weapons ('weapons of mass destruction') and of the means of delivering such weapons, constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and [declaring] a national emergency to deal with that threat."

13.     On June 28, 2005, the President, to take additional steps with respect to the national emergency described and declared in EO 12,938, issued EO 13,382 ("Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters") to target proliferators of WMD and their support networks and to deny designated proliferators access to the U.S. financial and commercial systems. EO 13,382 authorized the U.S. Secretary of the Treasury, in consultation with the U.S. Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the EO. Pursuant to that authority, on April 13, 2009, the Secretary of the Treasury promulgated the "Weapons of Mass Destruction Proliferators Sanctions Regulations." *See* 31 C.F.R. § 544.101 *et seq*. EO 13,382 and the Weapons of Mass Destruction Proliferators Sanctions Regulations prohibit transactions or dealings by any U.S. person or within the United States with individuals and entities placed on the SDN list, unless

exempt or authorized by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), which is located in Washington, D.C.

14.     On August 11, 2009, the Department of the Treasury designated the North Korean bank Korea Kwangson Banking Corp. ("KKBC") under EO 13,382 for providing financial services in support of both Tanchon Commercial Bank and Korea Hyoksin Trading Corporation, both of which were previously identified by the President as WMD proliferators. All three entities had been designated by the UN pursuant to UN Security Council Resolution 1718 for their roles in North Korea's WMD and missile programs. At the time of the designation, the Department of the Treasury Under Secretary for Terrorism and Financial Intelligence stated, "North Korea's use of a little-known bank, KKBC, to mask the international financial business of sanctioned proliferators demonstrates the lengths to which the regime will go to continue its proliferation activities and the high risk that any business with North Korea may well be illicit."

15.     On March 11, 2013, the Department of the Treasury designated the Foreign Trade Bank ("FTB"), North Korea's primary foreign exchange bank, pursuant to EO 13,382, for providing financial services that assisted in the proliferating of WMD. In the designation, Treasury stated, "North Korea uses FTB to facilitate transactions on behalf of actors linked to its proliferation network, which is under increasing pressure from recent international sanctions. . . . By designating FTB, the Treasury Department is targeting a key financial node in North Korea's WMD apparatus and cutting it off from the U.S. financial system. FTB is a state-owned bank established in 1959. FTB acts as North Korea's primary foreign exchange bank and has provided key financial support to [KKBC]."

16.     On March 15, 2016, the President, to take additional steps with respect to the previously described national emergency, issued EO 13,722 to address the Government of North

Korea's continuing pursuit of its nuclear and missile programs. Pursuant to that authority, on March 16, 2016, the Secretary of the Treasury promulgated the "North Korea Sanctions Regulations." *See* 31 C.F.R. § 510.101 *et seq*. EO 13,722 and the North Korea Sanctions Regulations prohibit the export of financial services from the United States or by any U.S. person to North Korea, unless exempt or authorized by OFAC. Under these orders, U.S. financial institutions were barred from providing correspondent banking services to North Korea entities.

17.    EO 13,466 and 13,722, and North Korea Sanctions Regulations also prohibited any transaction by any U.S. person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in these regulations.

### D.    Bank Secrecy Act

18.    Foreign financial institutions maintain U.S. dollar bank accounts ("correspondent accounts") at banks in the United States ("correspondent banks"). Correspondent accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to COCONSPIRATOR 3dle other financial transactions, such as currency conversions, related to such foreign financial institution. *See* 31 C.F.R. § 1010.605. Correspondent banks serve to support international wire transfers for foreign customers in a currency that the foreign customer's overseas financial institution normally does not hold on reserve, such as U.S. dollars, and to conduct currency conversions to/from U.S. dollars. It is through these correspondent accounts that the funds used in U.S. dollar transactions clear and/or are converted into other currencies.

19.    According to the U.S. Department of the Treasury, the global financial system relies on correspondent banking relationships. Nearly all U.S. dollar wire transactions conducted by foreign financial institutions are processed through correspondent bank accounts held in the United

States. Foreign financial institutions include not only banks, but also dealers of foreign exchange and money transmitters. *See* 31 C.F.R. § 1010.605(f).

20.     The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures to ensure that correspondent bank accounts established by foreign financial institutions are not used to finance terrorism or to avoid sanctions programs administered by OFAC.

21.     The Treasury Department's Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act in furtherance of its mission to safeguard the U.S. financial system. The Bank Secrecy Act gives FinCEN a range of options, called special measures, that can be adapted to target specific money laundering and terrorist financing concerns. *See* USA PATRIOT Act § 311, codified at 31 U.S.C. § 5318A. One such special measure imposed under Section 311 protects the integrity of the U.S. financial system by prohibiting financial institutions from causing U.S. financial instructions to engage in any type of financial transaction with any entity within the jurisdiction deemed an area of money laundering concern.

22.     In June 2016, FinCEN determined that the entire North Korean financial sector was a primary money laundering concern. Federal Register, Vol. 81, No. 107 (June 3, 2016). On November 9, 2016, FinCEN implemented a special measure, barring all U.S. financial institutions from maintaining a correspondent bank account for any North Korean financial institution or any party acting on its behalf. A second special measure required U.S. financial institutions to exercise "enhanced due diligence" and take reasonable steps to not process transactions for correspondent accounts of foreign financial institutions in the United States if such transaction involved a North Korean financial institution. In effect, FinCEN barred all North Korean financial institutions and entities acting on their behalf from engaging in U.S. dollar transactions through correspondent

banking transfers in the United States. Failure to comply with the special measure resulted in civil and criminal penalties for U.S. financial institutions.

23.     As a result of the North Korea Sanctions Regulations, the FinCEN 311 action, and overall risk management, correspondent banks refused to knowingly process any U.S. dollar wire transactions involving entities in North Korea.

**E.     Money Laundering**

24.     18 U.S.C. § 1956(h) criminalizes a conspiracy to violate § 1956.

25.     18 U.S.C. § 1956(a)(2)(A) (the international promotional money laundering statute) criminalizes transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.

26.     Pursuant to 18 U.S.C. § 1956(c)(7)(A), the term "specified unlawful activity," includes violations of 18 U.S.C. § 1344 (relating to bank fraud).

27.     Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity," includes violations of IEEPA.

28.     As noted above, U.S. financial institutions are barred, pursuant to the section 311(a) special measure, from engaging in financial transactions with North Korean financial institutions. As the FinCEN finding noted, North Korea makes "extensive use of deceptive financial practices, including the use of shell and front companies to obfuscate the true originator, beneficiary, and purpose behind its transactions," in part "to evade international sanctions." *See* Federal Register, Vol. 81, No. 217 at 78716, 78718. Your affiant is aware that North Korean entities have attempted to circumvent the section 311(a) ban by using foreign front companies to engage in financial transactions on their behalf. These financial transactions would be in violation of 22 U.S.C. § 9214,

if the parties openly acknowledged the involvement of the North Korean entities. Instead, the true North Korean counterparties to these transactions remain concealed in order to allow the U.S. dollars to be processed. This constitutes wire fraud, as the false transactions occur via wire, and are done in part to defraud the Treasury Department, which has forbidden such transactions. This also constitutes bank fraud, as the false transactions occur , in part, to defraud U.S. financial institutions, which are barred from conducting such transactions and could face civil and criminal penalties for not detecting these transactions. But for this scheme to defraud, the North Korean entities would not be able to gain property and funds in question, totaling millions of dollars.

29.     One of the primary means U.S. financial institutions use to comply with national anti-money laundering procedures is through regular consultation of listings of designated parties, to include OFAC's SDN list. OFAC's SDN list contains a number of persons (individuals and entities) designated under various North Korean sanctions programs.

30.     Based on my training and experience, I am aware that North Korean financial facilitators are aware of these designation lists and that U.S. financial institutions are obligated to conduct due diligence of their clients, in an attempt to prevent sanctioned parties from transacting in U.S. dollars. In turn, these North Korean entities have a documented practice of using front companies to avoid the imposition of designations and blockings, which may occur pursuant to IEEPA. These opaque U.S. dollar transactions by front companies promote IEEPA violations.

### F.      North Korea Banking and Use of Front Companies

31.      The North Korean financial sector is comprised of state-controlled financial institutions that use "front companies to conduct international financial transactions that support the proliferation of WMD and the development of ballistic missiles in violation of international and U.S. sanctions," and are subject to "little or no bank supervision or anti-money laundering or combating the financing of terrorism controls." 81 Fed. Reg. at 78,715.

32.      The United Nations Panel of Experts found that once North Korea could register a front company without overt links to the country through the assistance of foreign nationals, it became significantly easier for its firms to pass rudimentary due diligence checks by financial institutions and open and maintain bank accounts.

33.      North Korean entities used front companies to pay their counterparties in U.S. dollars. The use of front companies and stripping material information, such as the true counterparties to the transaction, from wire transfer instructions influence the decision making of the correspondent banks into processing transactions that they otherwise normally would not, and thus constitutes bank fraud.

### G.      North Korean Tobacco Market

34.      North Korea has been engaged in the production and trafficking of counterfeit cigarettes since 1992. Such trafficking is in part for the purpose of advancing procurement and financial activity for the benefit of the DPRK's WMD programs in contravention of U.S. prohibitions on such activity. According to the 2015 U.S. Department of State report titled The Global Illicit Trade in Tobacco: A Threat to National Security, cigarette smuggling "fuels transnational crime, corruption, and terrorism." I know from prior investigations that cigarettes—

especially counterfeit cigarettes—may be one of North Korea's largest single sources of hard currency revenue.

## V.    FACTS ESTABLISHING PROBABLE CAUSE

### A.    Summary of Scheme

35.    From at least on or about February 2009 until on or about March 2019, COCONSPIRATOR 1, COCONSPIRATOR 2, COCONSPIRATOR 3, SIM, and others known and unknown, engaged in a conspiracy to commit bank fraud by, among other things, using multiple front companies to purchase tobacco products from Company 1 and other goods for North Korean customers. The co-conspirators used false shipping records to smuggle tobacco and other goods into North Korea, and front companies to launder related U.S. dollar payments for these shipments. In so doing, the co-conspirators deceived correspondent banks in the United States, who would not have otherwise processed these transactions had they known about the nexus to North Korea.

36.    Additionally, from on or about March 15, 2016, until on or about March 14, 2019, COCONSPIRATOR 1, COCONSPIRATOR 2, COCONSPIRATOR 3, SIM, and others known and unknown, engaged in a conspiracy to violate U.S. sanctions barring trade with North Korea, and did violate those sanctions, by purchasing tobacco from Company 1 and other products, and reselling the same to North Korean customers, all in U.S. dollars. Indeed, the coconspirators discussed ways of circumventing the sanctions to allow the trade to continue, including the use of false shipping records and front companies.

37.    Specifically, the coconspirators executed the conspiracy by:

   a.    COCONSPIRATOR 1, COCONSPIRATOR 2, and COCONSPIRATOR 3, operated and ran a series of companies under the name of "Winney" ("the

WINNEY ENTITIES"). The WINNEY ENTITIES brokered sales of products for North Korean customers. COCONSPIRATOR 1 and COCONSPIRATOR 2 ran the companies and COCONSPIRATOR 3 was employed by the companies.

b.  SIM was employed by FTB. SIM arranged for payments to the WINNEY ENTITIES for various products procured by the WINNEY ENTITIES, on behalf of North Korean customers. SIM arranged for these payments using known KKBC/FTB front companies.

c.  According to bank records, from in or about November 2008 to in or about April 2019, the WINNEY ENTITIES operated at least eleven bank accounts as part of this scheme (the "WINNEY BANK ACCOUNTS"). During that time period, the WINNEY BANK ACCOUNTS were involved in approximately 336 U.S. dollar transactions totaling approximately $84,300,000. The WINNEY BANK ACCOUNTS originated approximately 263 U.S. dollar transactions totaling approximately $54,000,000 and received approximately 73 U.S. dollar transactions totaling approximately $30,300,000.

**B.    Individuals and Entities**

38.    SIM is a North Korean national, believed to currently reside in the United Arab Emirates. SIM has, on prior occasions, represented himself to be a South Korean national. During the relevant time period, SIM was employed by FTB.

39.    COCONSPIRATOR 1 is a Chinese national from Liaoning Province in China. COCONSPIRATOR 1 is believed to currently reside in China.

40.     COCONSPIRATOR 2 is a Chinese national from Liaoning Province in China. COCONSPIRATOR 2 is believed to currently reside in Australia.

41.     COCONSPIRATOR 3 is a Chinese national from Liaoning Province in China. COCONSPIRATOR 3 is believed to currently reside in the United Arab Emirates.

42.     The WINNEY ENTITIES include eight corporate entities operated by COCONSPIRATOR 2, COCONSPIRATOR 1, and COCONSPIRATOR 3. [1] According to corporate registry records, COCONSPIRATOR 2 and COCONSPIRATOR 1 are the beneficial owners/principal shareholders of the relevant WINNEY ENTITIES, and COCONSPIRATOR 3 has acted as a representative for several of the WINNEY ENTITIES.

    i.    Winney International Business Co. Limited ("Winney Entity 1") was registered in New Zealand in 2008. According to bank records, the majority of Winney Entity 1's incoming U.S. dollar wire transfers were from documented North Korean front companies.

    ii.    Winney Trading Co., Limited ("Winney Entity 2") was registered in England in 2013. According to bank records, in 2013, Winney Entity 2 began sending and receiving U.S. dollar correspondent account wire transfers. Winney Entity 2 used addresses in China, Hong Kong, and the United Kingdom as part of these transactions. The Hong Kong address used by Winney Entity 2 matched

---

[1] Based on my training and experience, I know that using companies in multiple countries with frequent name changes is common practice for entities attempting to avoid detection by law enforcement. Legitimate businesses typically work to establish a corporate brand, which then has an attendant reputation. Frequent name changes prevent the establishment of a brand or reputation. COCONSPIRATOR 2, COCONSPIRATOR 1, and COCONSPIRATOR 3 operated under variations of the "Winney" name for several years, but eventually changed their company names completely.

an address previously used by Winney Entity 1. According to bank records, as with Winney Entity 1, the majority of Winney Entity 2's incoming U.S. dollar wire transfers were from documented North Korean front companies.

iii.    Dandong Winney Trading Co. LTD ("Winney Entity 3") was registered in China in 2013. According to bank records, Winney Entity 3 was used on a limited basis, but also received U.S. dollar correspondent account wire transfers from at least one documented North Korean front company. The address for Winney Entity 3 on these bank records was the same office building as a now-sanctioned North Korean front company in Dandong, China.

iv.    Winney Tobacco FZCO ("Winney Entity 4") was registered in UAE in 2017.

v.    Winney FZCO ("Winney Entity 5") was registered in UAE in 2017.

vi.    Bluebay FZCO ("Winney Entity 6") was registered in UAE in 2019 as a successor to Winney Entity 4. According to email records in COCONSPIRATOR 3's and COCONSPIRATOR 2's email account, in 2019, Winney Entity 4 changed its name to Winney Entity 6.

vii.    Goldfield Tobacco FZCO ("Winney Entity 7") was registered in UAE in 2019 as a successor to Winney Entity 5. According to email records in COCONSPIRATOR 3's and COCONSPIRATOR 2's email account, in 2019, Winney Entity 5 changed its name to Winney Entity 7.

viii.    Ganzhou Guanli Supply Chain Management Co. LTD ("Winney Entity 8") was registered in Ganzhou, China in 2017.

43.    Company 1 is an international tobacco company located outside of Asia that sold tobacco to WINNEY ENTITIES between February 2009 and March 2019. Business records of

Company 1 show Company 1's business with WINNEY ENTITIES. These documents reveal that Company 1's goods first shipped to Dalian, China, and the goods were subsequently sent to North Korea.[2]

### C.    Evidence of Knowledge

44.    Emails associated with an account associated with SIM (hereinafter "Email Account 1") show that SIM was working as a North Korean financier for the now-sanctioned FTB and was knowingly assisting North Korea with sanctions violations.

45.    Email Account 1 was established in July 2016. I believe that Email Account 1 is operated by SIM and North Korean National 1 (NKN1), a coconspirator of SIM who also is believed to be working for FTB. A review of searches of Email Account 1 showed that between July 30, 2016 and June 1, 2019, approximately 48 e-mails were either addressed to or signed by SIM. A review of searches of Email Account 1 showed that between October 5, 2016 and January 18, 2019, approximately 36 e-mails were either addressed to or signed by NKN1.

46.    I believe Email Account 1 to be associated with SIM because:

- On October 5, 2016, Email Account 1 received an e-mail from an associate. There was no subject line and no body to the email, but there were two attachments. The attachment names were SIM's name and the name of NKN1. The documents were UAE electronic work permits for the two individuals, but needed signatures and fingerprints to be completed. That same day, Email Account 1 responded with the words "Thanks for yr kind cooperation" and

---

[2]  Based on my training and experience, such transshipment of goods is a common practice to avoid sanctions, and Dalian, China is a major smuggling point for goods entering North Korea due to the ability of North Korean-bound goods to go relatively undetected as Dalian has a very high volume of shipments clearing the port every day.

attached copies of the work permits that had the required signatures and fingerprints of SIM and NKN1. The associate, in their email, later changed the alias assigned to Email Account 1 to SIM's name.

- On April 3, 2017, Email Account 1 sent an e-mail to an account that was previously identified in another case as an FTB representative in Kuwait. The subject of the e-mail was "copy" with no body included. There were six attachments to the e-mail which were all copies and information from SIM's and NKN1's North Korean driver's licenses. Three days later, the FTB Kuwait representative responded with two attachments on the letterhead of the Embassy of the Democratic People's Republic of Korea in Kuwait. The documents had copies of the North Korean driver's licenses for SIM and NKN1 and verified that the driver's licenses were legitimate for both SIM and NKN1. These documents were then forwarded the next day to the individual that provided them with their electronic work permits.

- Email Account 1 was tied to a WeChat account and conversations that included attachments were documented in an email sent to Email Account 1. The emails would list the participants in the conversation, including SIM, who was listed in the WeChat as the user for Email Account 1.

47.     In emails associated with the account, both SIM and NKN1 use their true names and claim to be employees of FTB and its subsidiary KKBC. (Based on my experience, FTB and KKBC act interchangeably as KKBC is a subsidiary of FTB and both are entities sanctioned by OFAC.) According to emails obtained for various accounts associated with FTB and KKBC in a separate investigation into these entities, FTB and KKBC station representatives globally in order

to assist the bank in clearing financial transactions on behalf of the banks' clients. Further, shortly after Email Account 1 was opened, one of the first e-mails sent from the account was sent to the official KKBC office email in Dandong, China (kbcdbank@163.com), notifying the Dandong office and "H.O." (home office in North Korea) that this new email account had been established. The email was unsigned. SIM and NKN1 have continued to send emails to FTB headquarters using Email Account 1 and signing in their true names through at least 2019 using this e-mail address.

48.     Email communication from SIM on Email Account 1 shows that SIM was knowledgeable about North Korean money laundering techniques, specifically moving money between shell corporations. For instance, on August 3, 2016, the Email Account 1 users ask that the message be delivered to the "Home Office" for a Credit Advance to the Dubai Office (the message was titled "Dubai C/A 160803 H.O."). The message included coded instructions for how two payments should be made: $300,000 to be transferred from "OUR DANDONG (01113)" (most likely referring to the Dandong office of KKBC) to "KKG DUBAI DAEPYOBU," which translates to Dubai Embassy. The message included a note, "Note: Pls give P/O of 02-300 000.- to FTB Kuwait DAEPYOBU in favor of our Dubai rep. for fund transfer." The "02-300 000" reference is a coded part of the message. Based on my review of emails in this and other accounts of FTB representatives, "02" refers to a payment in U.S. dollars and the "300 000" is the amount of the payment. This shows that the account user is asking the KKBC office in North Korea to shift $300,000 to the FTB representative in Dubai in order for that representative to make a payment to "KKG DUBAI DAEPYBOU." This use of shell companies by KKBC and FTB to send and receive the funds evidence SIM's knowledge.

49.     Emails found on Email Account 1 show that the users (SIM and NKN1) were aware of U.S. sanctions against North Korea. Specifically, the users conducted various searches related to the same, including:

- "Sanctions List Search" – August 22, 2017 – corresponding visit to https://www.treasury.gov/resource-center/sanctions/Programs/Pages/Programs.aspx
- "us treasury sanctions" – August 22, 2017
- "us draft resolution on north korea" – September 7, 2017
- "us treasury" – September 26, 2017
- "new us sanctions on north korea" – September 26, 2017
- "ofac sanctions fact sheet" – September 26, 2017
- "north korea sanctions ofac" – September 26, 2017
- "fact sheet for us treasury on north korea" – September 26, 2017
- "fact sheet for us treasury" – September 26, 2017
- "us treasury" – September 26, 2017 – User visited "https://www.treasury.gov/ on this same day.
- "us sanctions on north korea" – September 26, 2017
- "ofac" – September 26, 2017
- "미재무성제재" – September 26, 2017 meaning US Treasury Sanctions in korean
- "us treasury sanction list" – October 18, 2017
- "eu sanctions list 2017" – Oct 18, 2017 – corresponding visit to "Free Sanction Lists Search – OFAC, UN, EU, HMT – NameScan
- "eu sanctions list" – Oct 18, 2017
- "fact sheet eu sanction on north korea" – Oct 18, 2017

50.     As explained, it appears that both SIM and NKN1 used Email Account 1 during 2017, and specifically, a comparison of emails sent on the days of these searches shows that on at least September 2, 2017, Email Account 1 received an e-mail from an FTB official located in Pyongyang, North Korea that was addressed to "Mr. Sim." This e-mail had four attachments, two of which were identifying documents of two different North Korean nationals along with notarization forms associated with the passed documents.

51.     Browser history associated with SIM and NKN1's e-mail account shows that they viewed a story titled "OFAC sanctions North Korean banks and bank employees – NK News" on September 26, 2017. This article, published on the same day as it was viewed, discussed "new

18

sanctions against North Korean individuals and entities . . . targeting numerous DPRK nationals working abroad and several of the country's banks. In total, eight North Korean banks and 26 individuals were designated by the Treasury's Office of Foreign Assets Control (OFAC)." Then U.S. Treasury Secretary Mnuchin was quoted in the article as saying "We are targeting North Korean banks and financial facilitators acting as representatives for North Korean banks across the globe." The article also specifically referenced the designation of North Korean banking representatives stationed in Dubai. The article went on to state that the OFAC press release "also identified another newly designated North Korean Individual in China" as being "associated with cash transfers from the Foreign Trade Bank office in Shenyang to banks affiliated with North Korean special organizations and Reconnaissance General Bureau operatives" or "RGB."

52.     A news article accessed the same day by the Email Account 1 users discussed the September 26, 2017 sanctions package stating, "The U.S. also used an additional designation to emphasize that two banks in North Korea are actually part of Kim's government: the Foreign Trade Bank of the Democratic People's Republic of Korea and the Central Bank of Democratic People's Republic of Korea. Both banks had been previously targeted under earlier sanctions authorities."

### D.     Payments to WINNEY ENTITIES from DPRK

53.     During the relevant time period, the WINNEY ENTITIES received payments from known DPRK Front Companies and SIM, an FTB employee, apparently associated with the WINNEY ENTITIES' North Korean procurement.

*Payments by Known DPRK Front Company*

54.     Dandong Hongxiang Industrial Development ("DHID") was a Chinese front company that between August 2009 and August 2016 laundered hundreds of millions of dollars for KKBC after KKBC's designation in August of 2009.   This conduct   led to a criminal

indictment in the District of Columbia. *See generally* Case No. 2:19-cr-00514 (D.D.C.). As alleged

in the indictment, DHID and its related entities received goods, such as coal, from North Korea.

In lieu of paying North Korea for these goods, KKBC directed DHID to pay third parties in U.S.

dollars for commodities that North Korea wanted to obtain. On September 26, 2016, the OFAC

sanctioned DHID and also noted DHID acted on behalf of KKBC.

    55.    According to bank records, between April 2012 to January 2016, DHID and its

front companies wired the WINNEY ENTITIES approximately $17,789,857. As described herein,

your Affiant believes there is probable cause that these payments were in reference to North

Korean transactions, including transactions related to Company 1's sales, as described further

herein.

| Date | Originator | Beneficiary | Amount |
|---|---|---|---|
| 12/02/09 | BLUE SEA BUSINESS COMPANY LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $206,506.00 |
| 12/28/09 | BLUE SEA BUSINESS COMPANY LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $231,238.02 |
| 12/28/09 | BLUE SEA BUSINESS COMPANY LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $43,809.00 |
| 12/28/09 | BLUE SEA BUSINESS COMPANY LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $128,609.91 |
| 12/30/09 | BLUE SEA BUSINESS COMPANY LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $32,998.10 |
| 01/08/10 | BLUE SEA BUSINESS COMPANY LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $626,309.27 |
| 01/20/10 | BLUE SEA BUSINESS COMPANY LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $197,139.43 |
| 01/20/10 | BLUE SEA BUSINESS COMPANY LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $91,492.16 |
| 02/25/10 | BLUE SEA BUSINESS COMPANY LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $252,323.00 |
| 02/25/10 | BLUE SEA BUSINESS COMPANY LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $253,694.00 |
| 02/26/10 | BLUE SEA BUSINESS COMPANY LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $63,919.00 |
| 03/02/10 | BLUE SEA BUSINESS COMPANY LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $101,317.00 |
| 03/18/10 | BLUE SEA BUSINESS COMPANY LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $602,568.00 |

| 06/01/10 | BLUE SEA BUSINESS COMPANY LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $113,920.00 |
|---|---|---|---|
| 08/23/10 | FANWELL LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $51,958.00 |
| 10/21/10 | FANWELL LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $818,986.50 |
| 04/23/12 | DA NDONG HONGXIANG INDUSTRIAL DEVELOPMENT CO | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $1,607,534.00 |
| 06/13/12 | DANDONG HONGXIANG INDUSTRIAL DEVELOPMENT CO | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $1,132,871.00 |
| 04/25/13 | DANDONG HONGXIANG INDUSTRIAL DEVELOPMENT CO | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $1,838,712.00 |
| 06/03/13 | DANDONG HONGXIANG INDUSTRIAL DEVELOPMENT CO | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $1,499,984.20 |
| 06/07/13 | DANDONG HONGXIANG INDUSTRIAL DEVELOPMENT CO | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $1,006,538.00 |
| 11/01/13 | SHEEN FAIR TRADING LTD | WINNEY TRADING CO LTD | $999,998.00 |
| 11/04/13 | SHEEN FAIR TRADING LTD | WINNEY TRADING CO LTD | $546,532.00 |
| 02/25/14 | DANDONG HONGXIANG INDUSTRIAL DEVELOPMENT CO | WINNEY TRADING CO LTD | $2,693,825.00 |
| 05/19/14 | DANDONG HONGXIANG INDUSTRIAL DEVELOPMENT CO | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $799,994.00 |
| 05/19/14 | DANDONG HONGXIANG INDUSTRIAL | WINNEY INTERNATIONAL BUSINESS CO | $799,994.00 |
| 08/12/14 | NICE FIELD INTERNATIONAL LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $5,200.00 |
| 11/05/14 | NICE FIELD INTERNATIONAL LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $33,082.00 |
| 01/21/15 | NICE FIELD INTERNATIONAL LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $41,952.00 |
| 04/28/15 | GOOD FIELD TRADING LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $57,238.00 |
| 05/20/15 | NICE FIELD INTERNATIONAL LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $29,854.00 |
| 09/29/15 | GOOD FIELD TRADING LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $209,982.00 |
| 10/22/15 | NICE FIELD INTERNATIONAL LIMITED | WINNEY INTERNATIONAL BUSINESS CO LIMITED | $49,797.00 |
| 01/11/16 | NICE FIELD INTERNATIONAL LIMITED | DANDONG WINNEY TRADING CO LTD | $619,982.00 |
| | | | $17,789,856.59 |

*Payments by FTB Employee SIM*

56.     SIM caused payments to be processed to the WINNEY ENTITIES for the North Korean procurement done by the WINNEY ENTITIES.

57.     For example, on June 16, 2018, Email Account 1 received an e-mail from a North Korean e-mail address with a user referred to as "Mr. Jo" (JO) in Dandong, a city on the Chinese – North Korean border. JO and Email Account 1 regularly emailed about wire payments, leading me to believe that JO may be associated with FTB. Attached to the email was a document on WINNEY ENTITIES' letterhead, which described how to make payments to the WINNEY ENTITIES, listed WINNEY ENTITIES' bank account details in Dubai, and an amount to be remitted to the account. The bank account listed on the form is a U.S. dollar bank account belonging to Winney Entity 4 ("Bank Account A").

58.     SIM also utilized another email account, Email Account 2,[3] a search warrant of which was done in a separate investigation. I believe this account to be associated with SIM due to an e-mail on December 22, 2017. This e-mail was from E-mail Account 2 to an unknown recipient. The e-mail states,

> Dear sir,
> How are you?
> This is SIM, staying in Dubai and sending you the result for Alegeria Issue as per request from Mr. Pak. It took some time for checking safe cannels and following cheaper prices.
> . . . .

---

[3]     When SIM started to use Email Account 2, he used the alias of "Ali" and also went by "Ali Sim" at times. In an e-mail chain on August 13, 2020 that originated with Email Account 1, SIM signed the e-mail as "Ali" when discussing with a bank transfer that SIM was trying to initiate with Unknown Recipient 2 ("UR2"). The e-mail was then forwarded to Email Account 2 which took over the communication with UR2 about the bank transfer. UR2 responded and addressed the user of Email Account 2 as "Ali," the same name that originated the conversation from Email Account 1. Email Account 2 responded and signed another e-mail as "Ali." This chain went back and forth until the issue was settled.

I can provide USD accounts overseas in some area such as Hong kong and Turkish, and also provide the documents such as invoice and contract, which are necessary for you to apply to the correspondent bank to transfer outside in USD.
I know you have been waiting for good news from me for over 2 weeks, but not succesful.

59.     On December 25, 2017, Email Account 2 forwarded this exchange to Email Account 1. There are several instances of messages being forward between Email Account 2 and Email Account 1. Further, Email Account 2 records show that the WINNEY ENTITIES' banking information was discovered on Email Account 2.

60.     On June 18, 2018, SIM sent an e-mail from Email Account 2 to an unknown recipient 1 ("UR1") with a payment instruction requesting $700,000 be sent to WINNEY ENTITIES' bank account at an Emirati bank, *i.e.*, Bank Account A. Bank records show that, on June 20, 2018, WINNEY ENTITES' account (Bank Account A) received a payment from "Company C" for $357,889.07 and another payment from "Company D" for $342,029.07. These payments total to $699,918.14. (The difference in this amount and the instructed amount given by SIM is most likely due to bank fees associated with the payments.)

61.     On June 21, 2018, SIM sent another e-mail to UR1 from Email Account 2. The text (in Korean) instructed the recipient to make a payment to WINNEY ENTITIES, to the same two accounts as before. SIM also told UR1 to transfer the funds without reconfirming in the morning the next day. The attachment to the e-mail is a payment instruction for the recipient to send $772,793 to WINNEY ENTITIES account in Dubai (Bank Account A). Bank records show that, on June 22, 2018," Company C" sent $389,232.09 to Bank Account A. Bank records show that, on June 26, 2018, "Company C" sent $383,479.13 to Bank Account A. Together these transfers total $772,711.22. (The discrepancy between this total and the original instructed amount from SIM is most likely due to banking fees associated with the transfers.)

62.     On July 12, 2018, SIM again sent an e-mail, using Email Account 2, to UR1 using coded language and apparently instructing for a payment of $336,231.62 be paid to WINNEY ENTITIES' account (Bank Account A). Bank records show that, on July 16, 2018, "Company E " sent $336,190.50 to the WINNEY ENTITIES' bank account (Bank Account A).

63.     Based on the foregoing, UR1 appears to have access to multiple front companies that are depositing these funds requests into WINNEY ENTITIES' accounts.

64.     Bank records for Bank Account A show that on the following dates this account received U.S. dollar payments that transited through the U.S. financial system, from front companies that appear to be associated with SIM and UR1.

| Date | ORIGINATOR | BENEFICIARY | Amount |
|---|---|---|---|
| 06/20/18 | Company C | WINNEY ENTITY 4 | $357,889.07 |
| 06/20/18 | Company D | WINNEY ENTITY 4 | $342,029.07 |
| 06/22/18 | Company C | WINNEY ENTITY 4 | $389,232.09 |
| 06/26/18 | Company C | WINNEY ENTITY 4 | $383,479.13 |
| 07/12/18 | Company E | WINNEY ENTITY 4 | $385,279.86 |
| 07/16/18 | Company E | WINNEY ENTITY 4 | $336,190.50 |

65.     Based on my training and experience, the payment information sent by "JO" on June 16, 2018 to Email Account 1was to allow the home office to direct payments from the various representatives around the world with ease. As SIM is the representative in Dubai, where WINNEY ENTITIES was operating at the time, it is consistent with SIM business practices to receive this payment information to disburse to companies that make payments for North Korea.

### E.      WINNEY ENTITIES' Tobacco Procurement

### 1. Purchases of Company 1's Tobacco Products

66.      Bank records and business records of Company 1 show that between February 2009 and March 2019, WINNEY ENTITIES procured tobacco products for North Korean customers from Company 1. During this time period, Company 1 received at least $42 million in wire transactions with WINNEY ENTITIES, all of which were processed in U.S. dollars. Between February 2009 and May 2016, Company 1's bills of lading typically listed a North Korean buyer. From May 2016 until March 2019, references to North Korea were removed from the bills of lading, However, the goods were all shipped to Dalian, China, a known point of smuggling for goods to North Korea. Thus, your affiant believes that most, if not all, of the $42 million in wire transactions between Company 1 and WINNEY ENTITIES during this time period were related to sales to North Korea.

67.      According to banking records and business records of Company 1:

- *Winney Entity 1.* Analysis of bank records from February 2009 to December 2017 show that roughly 85% of Winney Entity 1's outgoing U.S. dollar correspondent account wire payments related to purchasing tobacco from Company 1 as listed on the wire transfer memorandums.

- *Winney Entity 2.* According to bank records, as with Winney Entity 1, the majority of Winney Entity 2's outgoing U.S. dollar wire transfers were to Company 1 for tobacco purchases, as listed on the wire transfer memorandums, and related incoming transfers from documented North Korean front companies.

68.     Company 1's employee, CS-1,[4] a senior executive who worked for Company 1 during the relevant time period, stated that the WINNEY ENTITIES were controlled by COCONSPIRATOR 3 and COCONSPIRATOR 2. CS-1 met with COCONSPIRATOR 3 and COCONSPIRATOR 2 on different occasions.

69.     Company 1's records related to the Company 1's business dealings with WINNEY ENTITIES between February 2013 and March 2019 show:

- Bills of lading and invoices from WINNEY ENTITIES dated between February 2013 and March 2019 listed Dalian, China, as the destination of the goods purchased.

- In early 2013, the invoices listed NKTC1 as a consignee, or buyer, of Company 1 products. NKTC1's address in North Korea was also listed on the invoices. From prior investigations, I know that NKTC1 is a North Korean state-owned tobacco company that conducts financial transactions through and with the FTB.

- A Company 1 invoice dated September 18, 2014, for a purchase of tobacco from Company 1 by WINNEY ENTITIES, listed the destination as Dalian, China, and the invoice amount as $365,904. The consignee of the goods was listed as NKTC1 with an address in "Pyongyang, D.P.R.K (Democratic People's Republic of Korea)." This shipment was covered under a two-year contract between WINNEY ENTITIES and Company 1 worth approximately $9,000,000 and the contract specifies payment terms in U.S. dollars. Bank records show that on March 25, 2013, WINNEY ENTITIES made a payment to Company 1 that transited a U.S. bank in

---

[4]     The information received from CS-1 is corroborated by bank and e-mail records obtained in this investigation..

New York totaling approximately $1,047,103.20. CS-1 confirmed this payment was associated with the shipment being discussed.

70.     Additionally, CS-1 provided information about how the WINNEY ENTITIES attempted to evade North Korean Sanctions. CS-1 stated that the WINNEY ENTITIES used multiple different shipping companies from 2014 to 2015. CS-1 also stated that the WINNEY ENTITES were responsible for all the information listed on the bills of lading. For instance, in March 2016, instead of listing NKTC1 as the consignee, the WINNEY ENTITIES began listing a new consignee that your Affiant knows was later investigated for smuggling goods into North Korea. This change in practice coincided with the March 2016 imposition of country-wide sanctions on North Korea by the U.S. government. According to CS-1, the WINNEY ENTITIES were responsible for changes on the bills of lading, which removed all references of North Korea from vital shipping documents.

### 2. Bank Transactions Related to DPRK Tobacco Procurement

*Payments from DPRK Front Company Carbuncle to Company 1*

71.     Company 1 records show that WINNEY ENTITIES purchases of Company 1's products was facilitated by the use of a front company, "Carbuncle Business Company Limited" ("Carbuncle"). In 2013, Company 1 made various shipments to North Korean customers that were brokered by WINNEY ENTITIES, for which Company 1 was paid by Carbuncle.

- From February 25, 2013, to June 13, 2013, Company 1 sent five shipments for the customer Carbuncle, located in Hong Kong. On the bill of lading, the Consignee is listed as "Korea Carbuncle Business Company Limited," with an address in Shenyang, China. According to British corporate business registration documents,

Carbuncle was incorporated in England in September 2006 by DHID's CEO and is believed to be a front company for DHID.[5]

- All shipping documents related to these sales listed Dalian, China as the final destination of the goods. As stated, Dalian is a known hub for transshipment of goods to North Korea.

- Company 1 showed the bills associated with the goods delivered for Carbuncle were $593,406. Carbuncle and another front company established by DHID/KKBC ("DHID Front Company 2"), combined to make six payments to Company 1 totaling $593,370 between January 25, 2013, and August 8, 2013. Payments associated with these five shipments transited the U.S. financial system, as follows:

| Date | Originator | Beneficiary | Amount |
|---|---|---|---|
| 01/25/13 | CARBUNCLE BUSINESS COMPANY LIMITED | Company 1 | $35,604.36 |
| 03/15/13 | DHID Front Company 2 | Company 1 | $83,058.84 |
| 04/11/13 | CARBUNCLE BUSINESS COMPANY LIMITED | Company 1 | $118,681.20 |

---

[5]     Through a separate investigation, I know that Carbuncle was used to make a payment to a British tobacco company. Based on my review of bank and email records in that case, there is probable cause to believe that Carbuncle was used as a front company by DHID to aid KKBC in their attempts to process U.S. dollar transactions while being sanctioned by the U.S. government. For example, in a similar tobacco scheme involving a different international tobacco company that sold tobacco to North Korea, DHID made several payments to the company for tobacco that was shipped to North Korea. At times, DHID would move funds from an associated front company, evidenced by the registered agents, to make a payment for DHID. Carbuncle was one of the front companies used to pay this company for tobacco as they were used in this case.

Your affiant notes that the use of front companies is common with North Korean transactions. DHID itself was being used as a front company for North Korea, but to help hide the true number of transactions that DHID was performing, DHID would make and use its own front companies. This practice would cause US banks, that would not realize the front company relationship, to not have the full financial activity of DHID and would cause less of a spotlight to be shined on DHID for higher volumes of financial activity.

| 05/23/13 | DHID Front Company 2 | Company 1 | $118,663.20 |
| 06/21/13 | CARBUNCLE BUSINESS COMPANY LIMITED | Company 1 | $118,681.20 |
| 08/08/13 | CARBUNCLE BUSINESS COMPANY LIMITED | Company 1 | $118,681.20 |
| | | | $593,370.00 |

*Purchases of Company 1's Products for North Korean Trade Company 2*

72.     Emails of COCONSPIRATOR 2 showed that WINNEY ENTITIES brokered sales of Company 1's tobacco product for a North Korean buyer, North Korean Trade Company 2 ("NKTC2"). Open-source information shows that NKTC2 was a state-owned entity that is operated by North Korea's Ministry of People's Armed Forces and tasked with producing North Korean cigarettes. In 2016, two different subordinates of the Ministry of Peoples Armed Forces were sanctioned by OFAC. Both entities had ties to North Korea's nuclear and ballistic missile programs.

73.     On July 2, 2019, a WINNEY ENTITIES employee emailed COCONSPIRATOR 2 a chart of historical payments and amounts paid to NKTC2's suppliers by WINNEY ENTITIES and related companies. The chart reflected as follows:

| № | Remittance Date | Amount Received (USD) | Beneficiary | Note |
|---|---|---|---|---|
| 1 | 2019/3/14 | 144,343.62 | AG | 3/14지불한USD250,000$중에서USD105,656.38$는 종전건 확인서<N19-0327-1Y> USD1,385,750.4$에 포함하며  USD144,343.62$는 이번건에 포함 |
| 2 | 2019/3/24 | 220,000.00 | AG | 은행에 걸림, 실제접수못했음 |
| T3 | 2019/4/9 | 254,000.00 | HK | |
| 4 | 2019/4/22 | 260,000.00 | HK | |
| 5 | 2019/4/30 | 67,500.00 | Dubai | |
| 6 | 2019/5/6 | 14,701.00 | HK | HK$ 115,500.00로 접수함 |
| 13 | 2019/5/10 | 120,346.00 | HK | HK$ 945,000.00로 접수함 |
| 14 | 2019/5/14 | 295,400.00 | HK | |
| 15 | 2019/5/20 | 120,933.18 | HK | 5/20지불한USD320,934$중에서USD120,933.18 $는 이번건에  포함하며USD200,000.82$는 다음건USD1,811,577.12$에  포함할것 |

74.    Bank records show that the above payments routed through United States financial institutions via a series of front companies, including:

- *Payment No 1.* The note for the payment indicates that this payment was part of a larger U.S. dollar transfer, stating: "From 250,000 USD payment made on 3/14, 105,656.38 USD is part of the previous confirmation <N19-0327-1Y> 1,385,750.40 USD, and 144,343.62 USD is for this one." Bank records matched this information to a payment made to Company 1 (identified in the chart as "AG") by a front company ("Front Company A"). Bank records show that Front Company A made six payments to Company 1 from January to March of 2019 totaling $1,460,300.

- *Payment No. 2.* The note states that the payment was stopped by the bank and that Company 1 failed to receive it. Bank records show that a payment of $220,000 from Front Company B to Company 1 was stopped by a U.S. correspondent bank on April 3, 2019.

**F.    WINNEY ENTITIES' Helicopter Procurement**

75.    In March 2019, WINNEY ENTITIES procured a Russian helicopter for North Korean customers. Specifically, on March 1, 2019,

- A Russian-based email address sent five documents to an intermediary who appears to work with SIM.

- The intermediary thereafter forwarded the documents to Email Account 1 the same day.

- Email Account 1 forwarded the documents to COCONSPIRATOR 3 approximately one hour later.

76.     The documents forwarded from Email Account 1 to COCONSPIRATOR 3 on March 1, 2019, all related to a helicopter purchase by the WINNEY ENTITIES.

- One document, a 2018 sales contract, states that the helicopter was purchased by Company 2. The contract further states that a "partner" of the buyer, a third party ("Company 3") in Hong Kong, would fund the purchase of the helicopter for $424,000.

- Another document, a sales contract dated February 1, 2019, sent to COCONSPIRATOR 3 on March 1, 2019 showed the helicopter was subsequently sold from Company 2 to Winney Entity 5. The contract stated the helicopter was located in Khabarovsk, Russia and would be delivered to a port in North Korea. The contract listed a price of $300,000 that would be paid in advanced. COCONSPIRATOR 1 was listed on the contract as the representative for Winney Entity 5.

77.     On March 4, 2019, Email Account 1 received an e-mail with the subject line "FW: Sign contract." There was no content in the e-mail body, but attached were two pages of a loan contract.

- The first page showed that an individual was being named as a lender and that a law firm located in Zimbabwe was listed as the borrower of funds. The amount of the loan was $300,000, which is the amount the helicopter was purchased for later that month. The lender agreed to move the funds to the Zimbabwe law firms' bank account.

- The second page of the contract stated, "Upon receipt to above account, the Borrower transfer the designated amount after deducting 9.5% of deposited amount

to the below account of the Lender within 24 hours." The account listed as the end destination of the funds belongs to Winney Entity 5.

- The loan contract was signed by both the lender and the borrower.

78.     Based on the aforementioned documents, it appears that the WINNEY ENTITIES, with assistance from FTB employees, procured for North Korea a helicopter and that U.S. dollar funds were sent via a U.S. correspondent banking account from a Zimbabwean law firm to a WINNEY ENTITY as the payment for the same.

## VI.     CONCLUSION

79.     Based on facts described above, there is probable cause to believe that SIM Hyon-Sop and co-conspirators known and unknown have committed violations of 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 1344 (Bank Fraud), 31 U.S.C. § 5322 (The Bank Secrecy Act), 50 U.S.C. § 1705 (IEEPA), and 18 U.S.C. §§ 1956(a)(2)(A) and (h) (Money Laundering).

_____
Joy Gallante
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to
before me this \_\_\_\_ day of September, 2022

_____
The Honorable
Magistrate Judge for the District of Columbia